IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 22-12902-F

---

KEBIN VALENTIN A/K/A KEVIN VALENTIN,
MATTHEW DAVID VALENTIN, and ANABELY ACEVEDO,

*Plaintiffs-Appellants,*

v.

RMRP REALTY, LLC, 1245, LLC, T.J.F. REALTY CORP.,
RONALD T. FATATO, RONALD J. FATATO, and
INTER STATE SALES CORP. D/B/A INTERSTATE SALES CORP.,

*Defendants-Appellees.*

---

APPELLANTS' INITIAL BRIEF

---

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 20-CV-62263-AHS

---

Elliot Kozolchyk, Esq.
KOZ LAW, P.A.
800 East Cypress Creek Road
Suite 421
Fort Lauderdale, Florida 33334
Telephone: (786) 924-9929
ekoz@kozlawfirm.com

*Attorney for Plaintiffs-Appellants*

No. 22-12902-F
*Kebin Valentin, et al v. 1245, LLC, et al*

**APPELLANTS' CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Plaintiffs-Appellants, Kebin Valentin a/k/a Kevin Valentin, Matthew David Valentin, and Anabely Acevedo, pursuant to 11th Cir. R. 26.1-2, hereby file this Certificate of Interested Persons and Corporate Disclosure Statement:

1. 1245, LLC – *Defendant/Appellee*

2. Acevedo, Anabely – *Plaintiff/Appellant*

3. Adi Amit, P.A. – *Attorney for Defendants/Appellees*

4. Amit, Adi – *Attorney for Defendants/Appellees*

5. Fatato, Ronald J. – *Defendant/Appellee*

6. Fatato, Ronald T. – *Defendant/Appellee*

7. Inter State Sales Corp. d/b/a Interstate Sales Corp. – *Defendant/Appellee*

8. Koz Law, P.A. – *Attorney for Plaintiffs/Appellants*

9. Kozolchyk, Elliot A. – *Attorney for Plaintiffs/Appellants*

10. RMRP Realty, LLC – *Defendant/Appellee*

11. Singhal, Hon. Raag – *United States District Court Judge, Southern District of Florida*

12. T.J.F. Realty Corp. – *Defendant/Appellee*

13. Valentin, Kebin a/k/a Valentin, Kevin – *Plaintiff/Appellant*

14. Valentin, Matthew David – *Plaintiff/Appellant*

/s/*Elliot Kozolchyk*
Elliot Kozolchyk

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants Kebin Valentin a/k/a Kevin Valentin, Matthew David Valentin, and Anabely Acevedo respectfully request oral argument to further discuss why individual coverage applies to each Plaintiff-Appellant.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE
      DISCLOSURE STATEMENT ........................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF CONTENTS ...............................................................ii

TABLE OF CITATIONS .............................................................iii

STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES .vi

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION .vii

STATEMENT OF THE ISSUES .......................................................1

STATEMENT OF THE CASE ..........................................................2

   I.  THE COURSE OF PROCEEDINGS AND DISPOSITIONS IN THE
      COURT BELOW .............................................................2

   II. STATEMENT OF FACTS ....................................................3

      A. Plaintiffs' Duties ........................................................3

      B. K. Valentin's Interstate Communication ...........................8

      C. M. Valentin's and A. Acevedo's Interstate Communication ...12

   III.STANDARD OF REVIEW ...................................................18

SUMMARY OF THE ARGUMENT .................................................19

ARGUMENT AND CITATIONS OF AUTHORITY ...............................20

CONCLUSION ........................................................................24

CERTIFICATE OF COMPLIANCE .................................................25

CERTIFICATE OF SERVICE ........................................................26

# TABLE OF CITATIONS

**Cases**                                                                    **Page(s)**

*Allen v. Tyson Foods*,
121 F.3d 642 (11th Cir. 1997) .......................................................... 29

*Bankston v. Then*,
615 F.3d 1364 (11th Cir. 2010) ........................................................ 18

*Burton v. City of Belle Glade*,
178 F.3d 1175, 1187 (11th Cir. 1999) .............................................. 29

*Clemons v. Dougherty Cnty.*,
684 F.2d 1365, 1368-69 (11th Cir. 1982) ........................................ 29

*Dickens v. GC Servs. Ltd. P'ship*,
706 F. App'x 529 (11th Cir. 2017) ............................................. 18, 20

*Galvez v. Bruce*,
552 F.3d 1238 (11th Cir. 2008) ........................................................ 18

*Jackson v. BellSouth Telecomms.*,
372 F.3d 1250 (11th Cir. 2004) ........................................................ 29

\* *St. Elien v. All Cnty. Env't Servs.*,
991 F.3d 1197 (11th Cir. 2021) ......................................... 21, 27, 33

*Thorne v. All Restoration Servs.*,
448 F.3d 1264 (11th Cir. 2006) ............................................. 1, 19, 21

*Whatley v. CNA Ins. Cos.*,
189 F.3d 1310 (11th Cir. 1999) ........................................................ 18

*Wooden v. Bd. of Regents of the Univ. Sys.*,
247 F.3d 1262 (11th Cir. 2001) ........................................................ 29

## Statutes

28 U.S.C. § 1291 ................................................................. vii

28 U.S.C. § 1331 ................................................................. vii

28 U.S.C. § 2107 ................................................................. vii

29 U.S.C. § 201 ........................... vii, 1, 2, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 33

29 U.S.C. § 202 ................................................................. 28

29 U.S.C. § 203 ................................................................. 21

## Regulations

29 C.F.R. § 776.10 ............................................................. 23

29 C.F.R. § 779.103 ....................................................... 20, 22, 23, 26, 28

29 C.F.R. § 779.110 ............................................................. 26

29 C.F.R. § 779.112 ............................................................. 24

29 C.F.R. § 779.114 ............................................................. 24

29 C.F.R. §§ 779.111-779.118 .................................................. 26

## Rules

11th Cir. R. 26.1-2 ............................................................. C-1

Fed. R. App. P. 4 ............................................................. vii

Fed. R. App. P. 28 ............................................................. vi

Fed. R. App. P. 32 ............................................................. 36

Fed. R. Civ. P. 56 ................................................................... 2, 29

**Other Authority**

*Field Operations Handbook for the Department of Labor's Wage and Hour Division*
     (2016)  ................................................................... 24, 25, 26

## STATEMENT REGARDING ADOPTION
## <u>OF BRIEFS OF OTHER PARTIES</u>

Plaintiffs-Appellants Kebin Valentin a/k/a Kevin Valentin, Matthew David Valentin, and Anabely Acevedo do not adopt by reference any part of the brief of another party pursuant to Fed. R. App. P. 28(i).

**STATEMENT OF**
**SUBJECT-MATTER AND APPELLATE JURISDICTION**

Jurisdiction is proper in the United States Court of Appeals in the Eleventh Circuit under 28 U.S.C. § 1291, which grants jurisdiction of appeals from all final decisions of the district courts of the United States. On November 5, 2020, the Plaintiffs-Appellants Kebin Valentin a/k/a Kevin Valentin ("K. Valentin"), Matthew David Valentin ("M. Valentin"), and Anabely Acevedo ("A. Acevedo") (collectively "Plaintiffs") filed a complaint against Defendants-Appellees RMRP Realty LLC, 1245 LLC, T.J.F. Realty Corp., Ronald T. Fatato ("T. Fatato"), Ronald J. Fatato ("J. Fatato"), and Inter State Sales Corp. d/b/a Interstate Sales Corp. (collectively "Defendants") for violations of the overtime and minimum wage provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Doc 1. The district court has federal subject matter jurisdiction over this matter under 28 U.S.C. § 1331. On July 29, 2022, the district court entered Order [Doc 82] granting Defendants' Motion for Summary Judgment [Doc 44]. On August 1, 2022, the district court entered Final Judgment [Doc 83] in favor of Defendants. On August 28, 2022, Plaintiffs timely appealed the Final Judgment [Doc 83] and Order [Doc 82]. This appeal is from a final order or judgment by the district court that disposes of all of Plaintiffs' claims. Appellate jurisdiction thus exists because the notice of appeal was timely filed within 30 days of entry of the district court's Final Judgment [Doc 83]. *See Id.* § 2107(a); Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

Individual coverage under the FLSA protects employees (1) engaged in commerce or (2) engaged in the production of goods for commerce, and may include the use of instrumentalities of interstate commerce in their work such as regular and recurrent interstate telephone calls. *Thorne v. All Restoration Servs.*, 448 F.3d 1264, 1266 (11th Cir. 2006) (citing 29 U.S.C. § 207(a)(1) (2005)). Defendants employed Plaintiffs to perform a variety of duties related to the maintenance and management of Defendants' properties and tenants and perform work in Defendants' private homes. Doc 66-1, pp. 4-6, ¶ 22; Doc 66-2, pp. 3-5, ¶ 21; Doc 66-3, p. 3, ¶ 16. Defendants' office is in New York. Doc 66-1, p. 7, ¶ 29. K. Valentin communicated with Defendants' New York employees pertaining to Plaintiffs' tasks and duties three to five times per week (Doc 66-1, pp. 6-7, ¶ 28) and at least three to four times weekly (Doc 66-1, p. 6, ¶ 23). Additionally, M. Valentin and A. Acevedo used K. Valentin as an intermediary and messenger to communicate with Defendants' New York employees. Doc 66-1, p. 6, ¶¶ 23-26; Doc 66-2, p. 3, ¶ 14; Doc 66-3, p. 2, ¶ 11. The district court granted Defendants' Motion for Summary Judgment [Doc 44] and held that Plaintiffs did not establish individual coverage. Doc 82. Did the district court err in granting summary judgment in Defendants' favor?

**STATEMENT OF THE CASE**

**I.    THE COURSE OF PROCEEDINGS AND DISPOSITIONS IN THE COURT BELOW**

On November 5, 2020, K. Valentin and M. Valentin sued Defendants for violations of both the overtime and minimum wage provisions of the FLSA; A. Acevedo sued Defendants for violations of only the minimum wage provisions of the FLSA. Complaint, Doc 1. On July 29, 2022, the district court granted Defendants' Motion for Summary Judgment under Fed. R. Civ. P. 56(a). Doc 82. On August 1, 2022, the district court entered Final Judgment in favor of Defendants. Doc 83. On August 28, 2022, Plaintiffs filed their Notice of Appeal. Doc 85.

## II.    STATEMENT OF FACTS

### A. Plaintiffs' Duties

Plaintiffs had a variety of duties related to the maintenance and management

of Defendants' properties and tenants. K. Valentin's duties included the following:

> I was an all-around worker for Defendants and I took on
> several tasks and responsibilities depending on the needs
> of Defendants' business and personal needs of T. Fatato
> and J. Fatato. I did everything that was needed and
> required to be done at the Defendants' business and in the
> private homes of T. Fatato and J. Fatato. I performed work
> as a handyman, as a gardener, as a lawn care worker, and
> even as a domestic service worker in the private homes of
> T. Fatato and J. Fatato. The tasks, duties and
> responsibilities which I regularly and recurrently
> performed for Defendants included, but not limited to,
> cleaning all the common and shared areas within premises
> of the Coral Springs apartment; doing regular cleaning
> work in the private residence and properties of T. Fatato
> and J. Fatato; removing cable or internet wiring from
> walls; repairing all holes left on walls; painting walls,
> baseboards, doors and spot painting of ceilings - paintings
> consisted of three (3) bedrooms, two (2) full bathrooms,
> two (2) walk-in closet, one (1) long closet, kitchen, living-
> room, dining-room, and hallway; removing and replacing
> light fixtures, window blinds, door knobs, doors, frames
> (if broken), broken or warped wood flooring, caulking
> baseboards, kitchen countertops, bathtubs, and sinks
> countertops; replacing toilets if broken; repairing or
> replacing flush valves in toilet tanks and water hoses;
> removing and replacing kitchen and bathroom faucets and
> showerheads; replacing towel holders in bathroom walls;
> regrouting bathroom tiles; repairing and replacing garbage
> disposal mounted under kitchen sinks; removing and
> replacing any damaged electric sockets and light switches;
> removing and replacing all fire alarms; removing,
> replacing, or repairing ventilation fans in bathrooms;

cleaning the air conditioner unit and its closet – blowing it out with vac. airline and replacing its air filters; removing and replacing front door lock and bolt; replacing weather seals around front doors; removing and replacing stove range hoods; removing and replacing dishwashers and stoves; cleaning air vents or ducts in all rooms; replacing bathroom tiles; pressure cleaning tile floors in the apartments; cleaning all kitchen and bathroom cabinets and vanity; cleaning all appliances; removing and replacing all unusable heating elements on stove; helping with remodeling of new kitchens; removing and replacing moldy drywall; repairing or replacing walk-in closet shelving and closet doors; gardening and lawn services such as cutting grasses, edging, trimming, lowering surrounding shrubs and shaping them, shaping small trees around property fronts and sides, trimming tall tree branches around both properties, blowing leaves and picking them up, fertilizing the lawn, laying down mulch around properties, and spraying weed killer around properties; pressure cleaning the front walk ways, stairways, and door fronts; dusting around door fronts and ceilings and removed spiderwebs and other insects; spraying insecticide around building stairways, door fronts, storage areas, and around the building; spraying insecticide inside apartments, kitchens, and porch areas; cleaning storage areas and keeping them organized; picking up garbage on a daily basis; resurfacing asphalt on the parking areas of the apartments; painting parking signage for parking spots and handicap zones; showing the apartments and their immediate surrounding areas to prospective tenants; speaking with prospective tenants and/or realtor regarding their concerns about the application process for the apartment; walking new tenants through the property and having them fill out a walk-through sheet; regularly making lists of all concerns in the apartment that needed repairs; collecting move-in deposits to send to Defendants; giving tenants the keys to their apartments and mailboxes; doing the necessary repairs indicated in the walk-through list of new tenants; doing move-out walk-through with tenants to assess and list

down all the damages and repairs that would be needed; preparing all the necessary paperwork and making sure that they are signed by tenants before moving out; receiving from tenants who are moving out the keys of their apartments and mailboxes; removing any property or garbage left behind by tenants; assessing damages to apartment walls, bathrooms, and appliances; listing down all materials needed for painting and repairs; reporting to Defendants any appliance that needed repairs or replacements; taking pictures of the apartments right after tenants move out and when repairs are performed; purchasing from various hardware and department stores the materials needed; taking care of paperwork and filing of receipts; making copies of any paper needed to be given to the tenants; meeting with Section 8 Housing Authority Inspectors and showing them the apartments; meeting with City Inspectors to assist them in evaluating what was needed to keep the buildings compliant with the City Code and to avoid fines; opening tenant doors when locked out; supervising any plumbing work, electric work, lawn work or any person who came to the property to do work at any hour of the day; purchasing any equipment needed for the work to be done in the apartment; running back and forth between properties upon Defendants' request; answering all phone calls from Defendants pertaining to work that needed to be done or phone calls from tenants about any need or concern they had about their apartments on a twenty-four-seven basis; watching the property and the parking at night; and acting as the coordinator and intermediary between the Defendants and the tenant on rent issues or problems in the apartment.

Declaration of K. Valentin, Doc 66-1, pp. 4-6, ¶ 22.

M. Valentin's duties included the following:

I was an all-around worker for Defendants and I took on several tasks and responsibilities depending on the needs of Defendants' business and personal needs of T. Fatato and J. Fatato. I did everything that was needed and

required to be done at the Defendants' business and in the private homes of T. Fatato and J. Fatato. Not only did I work as a handyman, law service worker, and gardener, I also performed cleaning and domestic service work in the private homes of T. Fatato and J. Fatato. The tasks, duties and responsibilities which I regularly and recurrently performed for Defendants included, but not limited to, cleaning all the common and shared areas within premises of the Coral Springs apartment; doing regular cleaning work in the private residence and private properties of T. Fatato and J. Fatato; removing cable or internet wiring from walls; repairing all holes left on walls; painting walls, baseboards, doors and spot painting of ceilings - paintings consisted of three (3) bedrooms, two (2) full bathrooms, two (2) walk-in closet, one (1) long closet, kitchen, living-room, dining-room, and hallway; removing and replacing light fixtures, window blinds, door knobs, doors, frames (if broken), broken or warped wood flooring, caulking baseboards, kitchen countertops, bathtubs, and sinks countertops; replacing toilets if broken; repairing or replacing flush valves in toilet tanks and water hoses; removing and replacing kitchen and bathroom faucets and showerheads; replacing towel holders in bathroom walls; regrouting bathroom tiles; repairing and replacing garbage disposal mounted under kitchen sinks; removing and replacing any damaged electric sockets and light switches; removing and replacing all fire alarms; removing, replacing, or repairing ventilation fans in bathrooms; cleaning the air conditioner unit and its closet – blowing it out with vac. airline and replacing its air filters; removing and replacing front door lock and bolt; replacing weather seals around front doors; removing and replacing stove range hoods; removing and replacing dishwashers and stoves; cleaning air vents or ducts in all rooms; replacing bathroom tiles; pressure cleaning tile floors in the apartments; cleaning all kitchen and bathroom cabinets and vanity; cleaning all appliances; removing and replacing all unusable heating elements on stove; helping with remodeling of new kitchens; removing and replacing moldy drywall; repairing or replacing walk-in closet

6

shelving and closet doors; gardening and lawn services
such as cutting grasses, edging, trimming, lowering
surrounding shrubs and shaping them, shaping small trees
around property fronts and sides, trimming tall tree
branches around both properties, blowing leaves and
picking them up, fertilizing the lawn, laying down mulch
around properties, and spraying weed killer around
properties; pressure cleaning the front walk ways,
stairways, and door fronts; dusting around door fronts and
ceilings and removed spiderwebs and other insects;
spraying insecticide around building stairways, door
fronts, storage areas, and around the building; spraying
insecticide inside apartments, kitchens, and porch areas;
cleaning storage areas and keeping them organized;
picking up garbage on a daily basis; resurfacing asphalt on
the parking areas of the apartments; painting parking
signage for parking spots and handicap zones; showing the
apartments and their immediate surrounding areas to
prospective tenants; giving tenants the keys to their
apartments and mailboxes; doing the necessary repairs
indicated in the walk-thru list of new tenants; removing
any property or garbage left behind by tenants; assessing
damages to apartment walls, bathrooms, and appliances;
taking pictures of the apartments right after tenants move
out and when repairs are performed; making copies of any
paper needed to be given to the tenants; opening tenant
doors when locked out; running back and forth between
properties upon Defendants' request; and watching the
Coral Springs property and parking at night.

Declaration of M. Valentin, Doc 66-2, pp. 3-4, ¶ 21.

A. Acevedo's duties included the following:

The tasks, duties and responsibilities which I performed
for Defendants included, but not limited to, assisting and
providing help to K. Valentin and M. Valentin in the
performance of their jobs such as bringing them whatever
tools or materials they needed, cleaning the debris and dirt
caused by repair work, and painting the front doors of all

> the apartments; mopping floors in the apartment; dusting and thoroughly cleaning the appliances such as the washing machine, stove, refrigerator, dishwasher and other appliances including the furniture, cabinets, windows, and fixtures; cleaning the living room, dining room, and the kitchen area; taking out trash; eliminating cobwebs; picking up litters; replacing and washing the towels, bedsheets, pillowcases, linens, blankets in Defendants' properties that were rented to vacationers; and doing the cleaning jobs and domestic service work in the private homes and properties of T. Fatato and J. Fatato.

Declaration of A. Acevedo, Doc 66-3, p. 3, ¶ 16.

K. Valentin and A. Acevedo never received a paycheck or cash payments for all the work that they performed for Defendants. Doc 66-1, p. 10, ¶ 52.

## B. K. Valentin's Interstate Communication

Defendants' office is in Brooklyn, New York. Doc 66-1, p. 7, ¶ 29. K. Valentin communicated with Defendants' New York employees, including Maria Torres and Tony Quarantaa, three to five times per week and at least three to four times weekly:

> I could recall that I regularly and recurrently (3-5 times per week) communicated with two of Defendants' employees who were based in the state of New York, namely, Maria Torres and Tony Quarantaa. From the very beginning until the end of my employment with Defendants, I constantly communicated with Maria Torres and Tony Quarantaa; it is my understanding that they were both full-time employees of Defendants in the state of New York. Attached as Exhbit D [sic] shows a text message from T. Fatato instructing K. Valentin to call Tony Quarantaa.

Declaration of K. Valentin, Doc 66-1, pp. 6-7, ¶ 28.

The text message referenced above from T. Fatato directing K. Valentin to call Defendants' New York office and speak to "Tony"—i.e., Tony Quarantaa:



Doc 66-1, Exhibit D, p. 25.

> For at least three to four times in a week, I regularly and recurrently called Defendants' office in Brooklyn, New York to discuss matters or get instructions, clarifications,

> answers, or orders relating not only to the performance of my, M. Valentin's, or A. Acevedo's tasks, duties, and responsibilities but also relating to whatever issues, concerns, needs, or information that M. Valentin or A. Acevedo wanted me to raise to employees at Defendants' office in New York. M. Valentin and A. Acevedo regularly directed me several times per week to communicate with Defendants and their employees in New York concerning various duties within their employment, which I elaborate on more below. Defendants and their employees in New York would communicate with M. Valentin and A. Acevedo through me as an intermediary and direct their work and duties approximately 3 times per week as described below.

Declaration of K. Valentin, Doc 66-1, p. 6, ¶ 23. "My father, K. Valentin, regularly and recurrently communicated with Defendants' New York office for at least three to four times in a week." Declaration of M. Valentin, Doc 66-2, p. 3, ¶ 18. "My husband, K. Valentin, regularly and recurrently communicated with Defendants' New York office for at least three to four times in a week." Declaration of A. Acevedo, Doc 66-3, p. 2, ¶ 12.

> 24. The matters and issues which I often brought up on behalf of myself, M. Valentin, and A. Acevedo, in my communication with Defendants' employees in New York are city code requirements, housing inspector's findings and evaluations, other tenants' Section 8 housing assistance requirements, the use of the company provided bank card, and when needed, the use J. Fatato's "military discount" to purchases We[1] needed to make for Defendants at Lowes. I would also send, through email, the receipts of things that We bought for Defendants to Defendants' employees in the state of New York.

25. Aside from directly contacting me or communicating with T. Fatato, tenants of the Coral Springs apartment would communicate with the Defendants' Office in New York about their concerns, requests, issues, and problems regarding their apartment units. Defendants' New York office would, in turn, relay the messages to Us with instructions or orders of actions or tasks that had to be done. Attached as Exhibit C is an email sent by a former tenant at Coral Springs apartment to Maria Torres, a Defendants' employee in the state of New York.

26. In the same manner, tenants and renters of Defendants' properties in other Florida locations would also get in touch with Defendants' New York office regarding any requests, concerns, issues, and problems they had. Defendants' New York office would then coordinate with Us and give orders and instructions on what should be done on matters that the Defendants' New York office could not fully address or respond to.

Footnote 1: Hereafter, "We" and "Us" refer to M. Valentin, A. Acevedo, and me.

Declaration of K. Valentin, Doc 66-1, p. 7, ¶¶ 24-26.

K. Valentin's duties also included mailing to Defendants' New York office the security deposits and lease paperwork for tenants:

42. In all the tasks, duties and responsibilities which I performed for Defendants including the mailing of security deposits and lease requirements to Defendants' New York office[…].

Declaration of K. Valentin, Doc 66-1, p. 9, ¶ 42.

**C. M. Valentin's and A. Acevedo's Interstate Communication**

M. Valentin and A. Acevedo communicated with Defendants' employees in New York, including Maria Torres and Tony Quarantaa, at least 3-4 times per week with K. Valentin acting as an intermediary:

> 23. For at least three to four times in a week, I regularly and recurrently called Defendants' office in Brooklyn, New York to discuss matters or get instructions, clarifications, answers, or orders relating not only to the performance of my, M. Valentin's, or A. Acevedo's tasks, duties, and responsibilities but also relating to whatever issues, concerns, needs, or information that M. Valentin or A. Acevedo wanted me to raise to employees at Defendants' office in New York. M. Valentin and A. Acevedo regularly directed me several times per week to communicate with Defendants and their employees in New York concerning various duties within their employment, which I elaborate on more below. Defendants and their employees in New York would communicate with M. Valentin and A. Acevedo through me as an intermediary and direct their work and duties approximately 3 times per week as described below.

> 24. The matters and issues which I often brought up on behalf of myself, M. Valentin, and A. Acevedo, in my communication with Defendants' employees in New York are city code requirements, housing inspector's findings and evaluations, other tenants' Section 8 housing assistance requirements, the use of the company provided bank card, and when needed, the use J. Fatato's "military discount" to purchases We needed to make for Defendants at Lowes. I would also send, through email, the receipts of things that We bought for Defendants to Defendants' employees in the state of New York.

Declaration of K. Valentin, Doc 66-1, p. 6, ¶¶ 23-24.

12

Defendants' New York employees used K. Valentin as an intermediary to direct M. Valentin and A. Acevedo to correct and satisfy tenant concerns, requests, issues, and problems:

> 25. Aside from directly contacting me or communicating with T. Fatato, tenants of the Coral Springs apartment would communicate with the Defendants' Office in New York about their concerns, requests, issues, and problems regarding their apartment units. Defendants' New York office would, in turn, relay the messages to Us with instructions or orders of actions or tasks that had to be done. Attached as Exhibit C is an email sent by a former tenant at Coral Springs apartment to Maria Torres, a Defendants' employee in the state of New York.
>
> 26. In the same manner, tenants and renters of Defendants' properties in other Florida locations would also get in touch with Defendants' New York office regarding any requests, concerns, issues, and problems they had. Defendants' New York office would then coordinate with Us and give orders and instructions on what should be done on matters that the Defendants' New York office could not fully address or respond to.

Declaration of K. Valentin, Doc 66-1, p. 6, ¶¶ 25-26.

Defendants' New York employees used K. Valentin as an intermediary to communicate instructions and directives to M. Valentin and A. Acevedo regarding any work that needed to be done:

> 14. Whatever was needed to be done or accomplished was relayed to my father. My father would receive orders, directives, or instructions about what needed to be done for Defendants from either T. Fatato, J. Fatato or the employees from Defendants' New York office. Afterwards, my father would communicate with me and

13

> my mother, A. Acevedo, whatever information or message he received from either T. Fatato, J. Fatato or the employees from Defendants' New York office.

Declaration of M. Valentin, Doc 66-2, p. 3, ¶ 14.

> 11. Whatever was needed to be done or accomplished was relayed to my husband. My husband, K. Valentin, would receive orders, directives, or instructions about what needed to be done for Defendants from either T. Fatato, J. Fatato or the employees from Defendants' New York office. Afterwards, my husband would communicate with me and my son, K. Valentin, whatever information or message he received from either T. Fatato, J. Fatato or the employees from Defendants' New York office.

Declaration of A. Acevedo, Doc 66-3, p. 2, ¶ 11.

M. Valentin used K. Valentin as an intermediary to communicate with Defendants' New York employees regarding any materials, tools, or equipment needed to perform the work Defendants required:

> 15. Whenever I needed certain materials, tools, or equipment I would convey them to T. Fatato, J. Fatato or Defendants' office in New York through my father, K. Valentin.

Declaration of M. Valentin, Doc 66-2, p. 3, ¶ 15.

M. Valentin used K. Valentin as an intermediary to ask questions and obtain additional information from Defendants' New York employees regarding any work Defendants required:

> 16. When I had questions, clarifications, or when I needed more information about how certain work instructions or orders were supposed to be done, I would bring them up

14

> to T. Fatato, J. Fatato and employees at Defendants' office
> in New York through my father, K. Valentin, as an
> intermediary.

Declaration of M. Valentin, Doc 66-2, p. 3, ¶ 16.

A. Acevedo used K. Valentin as an intermediary and Spanish translator to

raise any work-related issues or incidents that she believed need to be addressed with

Defendants' New York employees:

> 13. Since I do not speak English, whenever there was
> apartment related or work-related issues, matters, needs,
> or incidents that I believed needed to be addressed, I
> brought them to the attention of T. Fatato, J. Fatato, or
> Defendants' office in the state of New York through K.
> Valentin. This occurred 1-5 times per week.
>
> 14. Whenever I saw the need to purchase materials,
> supplies, or replacement of broken tools, I would
> communicate them to T. Fatato, J. Fatato, or Defendants'
> office in the state of New York through K. Valentin.

Declaration of A. Acevedo, Doc 66-3, p. 2, ¶¶ 13-14.

K. Valentin was a messenger and intermediary with no autonomy or authority,

and all directions and decisions were made by Defendants or their New York

employees:

> 19. T. Fatato and J. Fatato controlled all aspects of my
> employment with Defendants including, but not limited to,
> assigning and directing my tasks, duties, and
> responsibilities, the time that I needed to work, the
> procedures and processes that I needed to follow, the
> provision of tools, equipment, and materials I needed for
> work, the determination of my pay, the supervision and
> evaluation of my work, and the monitoring of my

15

accomplishments. Attached as Exhibit B are emails of T. Fatato giving work instructions to K.Valentin.

[…]

21. I was never given any authority or responsibility to hire or fire a person for Defendants.

[…]

30. Whatever was needed to be done for or on behalf of Defendants had to go through or be ordered by T. Fatato, J. Fatato or any of his associates who were based in the state of New York. Defendants' work instructions and orders that I would get would usually include the involvement and participation of my wife, A. Acevedo, my son, M. Valentin, or both.

[…]

40. I would respond to tenant's complaints and requests for repairs, checked whether appliances were fully functional, made a report to Defendants about what needed to be done and made all the necessary purchases for any repair or restoration job that I and M. Valentin performed.

[…]

43. I did not have any set work schedule for Defendants but I worked long hours on a daily basis because I was required, expected and in fact, I carried out, any task that T. Fatato and his associates would assign at any time of the day including night time and the wee hours of the morning.

[…]

44. I lived at the Coral Springs apartment and the other tenants of the apartment approached or called me at any

> time of the day regarding any problems, issues, concerns,
> or emergencies they had regarding their apartments.

Declaration of K. Valentin, Doc 66-1, pp. 4, 7, 8, 9, ¶¶ 19, 21, 30, 40, 43, 44.

K. Valentin was, therefore, merely a conduit, messenger, and intermediary through which communication and information flowed between Defendants, Defendants' New York employees, and tenants on the one hand, and M. Valentin and A. Acevedo on the other hand.

Additionally, K. Valentin, M. Valentin, and A. Acevedo performed domestic work in the private homes of Defendants:

> I did everything that was needed and required to be done at the Defendants' business and in the private homes of T. Fatato and J. Fatato. I performed work as a handyman, as a gardener, as a lawn care worker, and even as a domestic service worker in the private homes of T. Fatato and J. Fatato. The tasks, duties and responsibilities which I regularly and recurrently performed for Defendants included, but not limited to, cleaning all the common and shared areas within premises of the Coral Springs apartment; doing regular cleaning work in the private residence and properties of T. Fatato and J. Fatato […].

Declaration of K. Valentin, Doc 66-1, p. 4, ¶ 22.

> 21. I did everything that was needed and required to be done at the Defendants' business and in the private homes of T. Fatato and J. Fatato. Not only did I work as a handyman, law service worker, and gardener, I also performed cleaning and domestic service work in the private homes of T. Fatato and J. Fatato. The tasks, duties and responsibilities which I regularly and recurrently performed for Defendants included, but not limited to, cleaning all the common and shared areas within premises

17

of the Coral Springs apartment; doing regular cleaning work in the private residence and private properties of T. Fatato and J. Fatato […].

Declaration of M. Valentin, Doc 66-2, p. 3, ¶ 21.

16. The tasks, duties and responsibilities which I performed for Defendants included, but not limited to, assisting and providing help to K. Valentin and M. Valentin in the performance of their jobs […] and doing the cleaning jobs and domestic service work in the private homes and properties of T. Fatato and J. Fatato.

Declaration of A. Acevedo, Doc 66-3, p. 3, ¶ 16.

## III.   STANDARD OF REVIEW

The standard of review is *de novo*:

We review questions of statutory interpretation de novo. *Bankston v. Then*, 615 F.3d 1364, 1367 (11th Cir. 2010). We also review a district court's grant of summary judgment de novo, applying the same legal standards as the district court. *Galvez v. Bruce*, 552 F.3d 1238, 1241 (11th Cir. 2008). We view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in favor of the party opposing summary judgment. See id.; Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

*Dickens v. GC Servs. Ltd. P'ship*, 706 F. App'x 529, 533 (11th Cir. 2017).

## SUMMARY OF THE ARGUMENT

Individual coverage under the FLSA protects employees (1) engaged in commerce or (2) engaged in the production of goods for commerce, and may include the use of instrumentalities of interstate commerce in their work such as regular and recurrent interstate telephone calls. *Thorne*, 448 F.3d at 1266 (citing 29 U.S.C. § 207(a)(1)). Plaintiffs submitted declarations and citations to their deposition transcripts evidencing their interstate communication with Defendants' employees in New York three to five times per week, and their domestic work that included duties inside the private homes of Defendants. These regular and recurrent work-related interstate communications and domestic work trigger FLSA's individual coverage. The district court erred in granting Defendants' Motion for Summary Judgment [Doc 44] by holding that Plaintiffs failed to establish individual coverage.

## ARGUMENT AND CITATIONS OF AUTHORITY

Plaintiffs' long hours, expansive duties (including in Defendants' private homes), and miniscule pay conjure images of indentured servitude. Defendants used Plaintiffs' fear of homelessness to exploit their labor. Doc. 66-1, p. 10, ¶ 54. But the issue for this appeal is whether FLSA coverage exists. The district court should have concluded that individual coverage applies to Plaintiffs or that sufficient facts were disputed for the issue to be resolved by the jury. The district court should have denied Defendants' Motion for Summary Judgment [Doc 44] because Plaintiffs submitted sufficient evidence to establish that they are each individually covered under the FLSA. The operative legal standard required the district court to "view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in favor of the party opposing summary judgment." *Dickens*, 706 F. App'x at 533.

Individual coverage applies to "clerical and other workers who regularly use the mails, telephone or telegraph for interstate communication." 29 C.F.R. § 779.103:

> The Supreme Court has articulated that it is the intent of Congress to regulate only activities constituting interstate commerce, not activities merely affecting commerce. *McLeod v. Threlkeld,* 319 U.S. 491, 497, 63 S.Ct. 1248, 87 L.Ed. 1538. Therefore, for an employee to be "engaged in commerce" under the FLSA, he must be directly participating in the actual movement of persons or things in interstate commerce by (i) working for an instrumentality of interstate commerce, *e.g.,* transportation or communication industry employees, or

20

> (ii) by regularly using the instrumentalities of interstate commerce in his work, *e.g.,* **regular and recurrent use of interstate telephone, telegraph, mails, or travel.** 29 C.F.R. § 776.23(d)(2) (2005); 29 C.F.R. § 776.24 (2005). *See, e.g., McLeod,* 319 U.S. at 493–98, 63 S.Ct. 1248 (finding that plaintiff's activities were purely local, and he was not engaged in commerce when he merely cooked and cleaned for railroad workers).

*Thorne*, 448 F.3d at 1266 (emphasis added).

The Eleventh Circuit has held that an employee communicating by phone out of state three to five times per week as part of her employment provides a legally sufficient basis for a reasonable jury to find that the employee falls within the coverage of the FLSA:

> The FLSA defines "[c]ommerce" to mean "trade, commerce, transportation, transmission, *or communication* among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b) (emphasis added). As a matter of plain text, then, it would seem that St. Elien "engaged in commerce" because she engaged in "communication . . . between any State and any place outside thereof." After all, she was in Florida and she called—that is, engaged in communication with— customers and vendors in other states and, in one instance, another country. And she did so three to five times a week as part of her work for All County. That, we think, is sufficient to permit a rational jury to conclude that St. Elien was individually covered by the FLSA.

*St. Elien v. All Cnty. Env't Servs.*, 991 F.3d 1197, 1199 (11th Cir. 2021).

K. Valentin's work-related interstate telephone calls to Defendants' New York employees three to five times per week during his employment are sufficient

21

to trigger individual coverage under the FLSA. Individual coverage, therefore, applies to K. Valentin. For the reasons discussed below, individual coverage also applies to M. Valentin and A. Acevedo.

The FLSA draws no distinction between physical objects and intangible communication and information when assessing an employee's involvement in the interstate movement of "things" for purposes of triggering individual coverage. Regulations promulgated by the Department of Labor define "engaged in commerce" to include any work involved or related to the interstate movement of persons or things: "Employees are 'engaged in commerce' within the meaning of the Act when they are performing work involving or related to the movement of persons or things (whether tangibles or intangibles, and including information and intelligence) among the several States or between any State and any place outside thereof." 29 C.F.R. § 779.103 - Employees "engaged in commerce." Emphasis added.

Interstate movement of "things" include "tangibles or intangibles, and include[] information and intelligence." *Id.*

> [S]ince "commerce" as used in the Act includes not only "transmission" of communications but "communication" itself, employees whose work involves the continued use of the interstate mails, telegraph, telephone or similar instrumentalities for communication across State lines are covered by the Act. This does not mean that any use by an employee of the mails and other channels of communication is sufficient to establish coverage. But if

the employee, as a regular and recurrent part of his duties, uses such instrumentalities in **obtaining or communicating information or in sending or receiving written reports or messages**, or orders for goods or services, or plans or other documents across State lines, he comes within the scope of the Act as an employee directly engaged in the work of "communication" between the State and places outside the State.

29 C.F.R. § 776.10 - Employees participating in the actual movement of commerce (emphasis added).

Thus, DOL regulations make clear that interstate movement of "things" includes communication, information, intelligence, reports, messages, etc. The FLSA draws no distinction between physical objects and intangible communication and information when assessing an employee's interstate movement of "things" for purposes of triggering individual coverage.

DOL regulations are also clear that each employee involved in the interstate movement of the "things"—e.g., communication and information—is "engaged in commerce" and protected by the FLSA under individual coverage: "The courts have made it clear that this includes **every employee employed in the channels of such commerce or in activities so closely related to this commerce, as to be considered a part of it as a practical matter.**" 29 C.F.R. § 779.103 - Employees "engaged in commerce." Therefore, each employee involved in, or closely related to, the interstate movement of "things" (including communication and information)

23

is considered a part of it as a practical matter for purposes of triggering individual coverage.

For example, under DOL regulations, solely intrastate truck drivers that regularly and recurrently transport from local terminals goods originating out of state, and dispatchers who route, plan or otherwise control such out-of-state deliveries and pickups, are engaged in interstate commerce within the meaning of the FLSA and, therefore, individually covered. *Id.* § 779.114.

Similarly, office workers that prepare reports bound for out-of-state recipients—even if they are not personally the ones transmitting the information interstate—are engaged in commerce:

> [O]ffice employees of retail businesses who regularly and recurrently check records of and make payments for goods shipped to their employer from outside of the State, or regularly and recurrently keep records of or otherwise work on the accounts of their employer's out-of-State customers, or **who regularly and recurrently prepare or mail letters, checks, reports or other documents to out-of-State points, are engaged both in commerce and in the production of goods for commerce within the meaning of the Act.** Likewise, timekeepers who regularly and recurrently prepare and maintain payrolls for and pay employees who are engaged in commerce or in the production of goods for commerce are themselves engaged in covered activities.

29 C.F.R. § 779.112 - Office employees (emphasis added).

The Field Operations Handbook for the Department of Labor's Wage and Hour Division (2016) ("FOH") describes many examples where workers that generate

reports, information, and other communication *locally*, but intended for interstate transmittal, are themselves individually covered under the FLSA:

- "The preparation of reports for direct or indirect interstate transmission is also individually covered." FOH, § 11a02(b).

- Employees performing local surveys with a questionnaire, which information will then be transmitted interstate, are individually covered. *Id.* § 11a03.

- "Employees engaged in the preparation of blueprints, sketches, plans, and the like, are covered on an individual basis if, the blueprints, etc., move either directly or indirectly in interstate commerce." *Id.* § 11b01.

- "Recordkeeping activities, incident to the sending and receiving of such subjects of interstate commerce, performed by office and clerical employees are so closely related to the interstate movement that the recordkeeping employees too are regarded as engaged in interstate commerce." *Id.* § 11c00(a).

- "Those who not only transmit, but also prepare letters, bills, contracts, and other papers which are sent out of the state, are actually engaged in the production of goods for interstate commerce." *Id.* § 11c00(b).

- "[E]mployees engaged in the preparation of financial reports, statements, correspondence, or other written material for transmittal across state lines." *Id.* § 11c02.

- "Employees such as news-gatherers, reporters, and clerical employees are engaged in activities closely related and directly essential to the production of the news, etc., being transmitted." *Id.* § 11c03(b).

Although 29 C.F.R. §§ 779.111-779.118 and FOH identify specific jobs (e.g., truck drivers, dispatchers, office employees, etc.), DOL regulations are clear that such jobs are only illustrative examples and that there are many classes of employees whose activities would be protected under FLSA's individual coverage:

> The discussion in §§ 779.103 to 779.109 included general reference to types of employees in the retail or service field whose individual activities constitute engagement in interstate or foreign commerce or in the production of goods for such commerce within the meaning of the Act. There are many classes of employees customarily employed by retail or service establishments or enterprises whose individual activities ordinarily constitute engagement in commerce or in the production of goods for commerce within the meaning of the Act. The groups of employees discussed in the following §§ 779.111 to 779.118, are illustrative only. There are other employees whose activities may be covered; also there are other activities performed by the groups discussed which would result in individual coverage under the Act.

*Id.* § 779.110 Employees in retailing whose activities may bring them under the Act.

26

In summary, FLSA individual coverage applies to employees involved in regular and recurrent interstate movement of "things." It does not matter whether the things being moved interstate are physical, or intangible communication or information. Finally, every employee involved in the interstate movement of the communication is considered part of it as a practical matter and, therefore, individually covered under the FLSA.

Plaintiffs are all individually covered under the FLSA. K. Valentin is individually covered because he communicated with Defendants' employees located in New York three to five times per week and at least three to four times per week. *See St. Elien*, 991 F.3d at 1198.

M. Valentin and A. Acevedo are individually covered because they communicated with Defendants' employees in New York through K. Valentin as an intermediary. Defendants' New York employees used K. Valentin as a conduit to send and receive communication and information to and from M. Valentin and A. Acevedo regarding each Plaintiff's work and duties. K. Valentin had no independent authority or autonomy to act in any way beyond a messenger as it pertained to the communication, instruction, and direction provided to M. Valentin and A. Acevedo from Defendants' New York employees. Similarly, M. Valentin and A. Acevedo would report to, and communicate with, Defendants' New York employees

27

regarding issues that arose and work that needed to be done using K. Valentin as their messenger.

Defendants and their employees in New York directed and supervised the work and duties of all Plaintiffs, but used K. Valentin as a siphon through which communication flowed. Defendants' New York employees' use of K. Valentin as a proxy to receive and transmit communication to and from M. Valentin and A. Acevedo does not alter the communication's interstate character nor sever its interstate continuity. M. Valentin's and A. Acevedo's regular and recurrent communication with Defendants and their employees in New York through K. Valentin is so closely related to interstate communication that M. Valentin and A. Acevedo are "employee[s] employed in the channels of such commerce" and "so closely related to this commerce, as to be considered a part of it as a practical matter." 29 C.F.R. § 779.103.

Finally, there is a separate basis for individual coverage independent of interstate communication: All three Plaintiffs are individually covered as "domestic service employees." Employees that perform domestic services in and around homes—such as handymen and gardeners—are domestic service employees covered by the FLSA. Pursuant to 29 U.S.C. § 202, FLSA's individual coverage applies to domestic service workers.

The district court erred by failing to resolve disputed facts in favor of Plaintiffs—the nonmoving parties. "Summary judgment is appropriate where 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Wooden v. Bd. of Regents of the Univ. Sys.*, 247 F.3d 1262, 1271 (11th Cir. 2001) (quoting Fed. R. Civ. P. 56(c)). Courts "'must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.'" *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004) (quoting *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997)). "'All reasonable doubts about the facts should be resolved in favor of the non-movant.'" *Jackson*, 372 F.3d at 1280 (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999); *Clemons v. Dougherty Cnty.*, 684 F.2d 1365, 1368-69 (11th Cir. 1982)) (citations omitted).

The district court acknowledges the disputed fact that Plaintiffs communicated with Defendants' New York employees:

> Plaintiffs claim they regularly contacted Defendants at their New York office, sent receipt and e-mails to the New York office employees, and communicated with the New York office to coordinate requests. (Pl. Stat. (DE [66]) at ¶ 47) (citing to the Declaration of Kebin Valentin aka Kevin Valentin (DE [66-1])). Defendants insist Plaintiff Kebin Valentin solely communicated and reported to Defendant Ronald T. Fatato (Def. Stat. (DE [45]) at ¶ 47); see also (Def. Stat. (DE [73]) at ¶ 54).

Order, Doc 82, p. 4.

Rather than resolve that disputed fact in Plaintiffs' favor, however, the district

court erred by resolving it against Plaintiffs and in Defendants' favor:

> Plaintiff Kebin Valentin's regular and recurrent work-
> related communications with RMRP Realty, LLC and
> T.J.F. Corp. were with Ronald T. Fatato and were
> conducted in person or by telephone. (Def. Stat. (DE [45])
> at ¶ 46); (Pl. Stat. (DE [66]) at ¶ 46) (claiming Plaintiff
> Kebin Valentin actually communicated regularly with
> Ronald T. Fatato, Ronald J. Fatato, and Defendants' New
> York employees).

Order, Doc 82, p. 6.

Plaintiffs' Amended Response to Defendants' Statement of Material Facts

contains numerous references to Plaintiffs' interstate communications with

Defendants' New York employees: "The security deposits would ultimately be sent

by mail to the Defendants' New York office including all the lease requirements for

final verification and validation before new tenants became eligible to move in."

Doc 66, p. 8, ¶ 40 (citing Doc 66-1, p. 6, ¶ 27). "Not only did K. Valentin regularly

and recurrently communicated with T. Fatato but also with J. Fatato and with

Defendants' New York employees." Doc 66, p. 9, ¶ 46 (citing Doc 66-1, p. 6, ¶ 23).

> For at least 3-5 times weekly, K. Valentin regularly and
> recurrently called Defendants' New York office to discuss
> matters or get instructions, clarifications, answers, or
> orders relating not only to the performance of Plaintiffs'
> tasks, duties, and responsibilities but also relating to
> whatever issues, concerns, needs, or information that M.
> Valentin or A. Acevedo wanted to raise before
> Defendants' New York employees.

Doc 66, pp. 9-10, ¶ 46 (citing Doc 66-1, p. 6, ¶ 23; Doc 66-2, p. 3, ¶ 18; Doc 66-3,

p. 2, ¶ 12; Doc 45-3, 122:7-23); Doc 66, p. 10, ¶ 47 (citing same).

> The matters and issues which K. Valentin oftentimes
> brought up in his communication with Defendants' New
> York employees are city code requirements, housing
> inspector's findings and evaluations, other tenants'
> Section 8 housing assistance requirements, the use of the
> company provided bank card, and when needed, the use J.
> Fatato's "military discount" to purchases he needed to
> make for Defendants at Lowes.

Doc 66-1, p. 6, ¶ 23; Doc 45-3, 41:11-19. "K. Valentin would also send, through

email, the receipts of everything that he bought for Defendants to Defendants' New

York employees." Doc 66, p. 10, ¶ 47 (citing 66-1, p. 6, ¶ 23).

> Aside from directly contacting K. Valentin or
> communicating with T. Fatato, tenants of the Coral
> Springs apartment would communicate with the
> Defendants' New York office about their concerns,
> requests, issues, and problems regarding their apartment
> units. Defendants' New York office would, in turn, relay
> the messages to K. Valentin with instructions or orders of
> actions or tasks that had to be done. In the same manner,
> tenants and renters of Defendants' properties in other
> Florida locations would also get in touch with Defendants'
> New York office regarding any requests, concerns, issues,
> and problems they had. Defendants' New York office
> would then coordinate with K. Valentin and give orders
> and instructions on what should be done on matters that
> the Defendants' New York office could not fully address
> or respond to. K. Valentin regularly and recurrently
> communicated with two Defendants' New York
> employees; namely, Maria Torres and Tony Quarantaa.

Doc 66, pp. 10-11, ¶ 47. "All checks that Defendants mailed to Plaintiffs came from New York." Doc 66, p. 12, ¶ 53. "All of Plaintiffs' tasks and duties went through or were ordered by T. Fatato, J. Fatato, or their New York employees and always included or required A. Acevedo and M. Valentin." Doc 66, p. 12, ¶ 55. "M. Valentin always assisted and helped K. Valentin in all the tasks, duties and responsibilities for Defendants, including the mailing of security deposits and lease requirements to Defendants' New York office […]." Doc 66, p. 13, ¶ 71.

The district court erred by resolving these disputed facts in Defendants' favor by accepting Defendants' position that Plaintiffs did not communicate with any of Defendants' New York employees and that all communications were instead with Defendant Ronald T. Fatato:

> Plaintiff Kebin Valentin never traveled outside of Florida for purposes of his employment. In the Declaration of Ronald T. Fatato (DE [45-1]), Defendant Ronald T. Fatato declared that, while Plaintiff Kebin Valentin regularly communicated with Defendant Ronald T. Fatato over the phone, Defendant Ronald T. Fatato resided in South Florida. Plaintiff Kebin Valentin presented no evidence to dispute Defendant Ronald T. Fatato's declaration except to claim the calls were made to Defendant Ronald T. Fatato's New York mobile cellphone and his checks were mailed from New York.

Order, Doc 82, p. 12.

The district court erred by concluding that K. Valentin would have had to travel outside Florida to trigger individual coverage:

> For Plaintiffs to survive summary judgment, they needed to produce admissible evidence that they (1) worked directly for an instrumentality of interstate commerce, or (2) regularly used the instrumentalities of interstate commerce. See Corwin v. Walt Disney World Co., 475 F.3d 1239, 1249 (11th Cir. 2007). Plaintiff Kebin Valentin was hired by RMRP Realty, LLC and, later, by T.J.F. Reatly, Corp. to provide maintenance-type services. […] Plaintiff Kebin Valentin was not working directly for an instrumentality of interstate commerce. Plaintiff Kebin Valentin would therefore have had to come forward with evidence, beyond mere speculation, that, as a part of his work duties, he repeatedly traveled to and from Defendants' job sites outside of Florida or used an item moving in interstate commerce. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Plaintiffs did not. […] [A]s Plaintiff Kebin Valentin did not "travel" across state lines as part of his work for Defendants, he cannot claim individual coverage. […] Plaintiff Kebin Valentin did not make a showing that he directly engaged in interstate commerce as a part of his responsibilities and, thus, cannot survive summary judgment on this record.

Order, pp. 12-13.

As discussed above, K. Valentin's interstate communications with Defendants' New York employees three to five times per week (Doc 66-1, pp. 6-7, ¶ 28) and at least three to four times weekly (Doc 66-1, p. 6, ¶ 23) are sufficient to trigger FLSA's individual coverage. *St. Elien*, 991 F.3d at 1199.

The district court acknowledges the disputed fact that Defendants mailed Plaintiffs checks from New York, but appears to resolve it in Defendants' favor:

> In Plaintiffs' Amended Statement of Facts (DE [66]), Plaintiffs claim all checks Defendants mailed to Plaintiffs came from New York. (Pl. Stat. (DE [66]) at ¶ 53); *see also* (Pl. Stat. (DE [66]) Ex. P at 132); *but see* (Def. Stat. (DE [73]) at ¶ 53) (disputing the insinuation and pointing to the documents attached by Plaintiffs to Kebin Valentin's Declaration (DE [66-1]) which "demonstrate that, while the return sticker on the envelope included RMRP Realty, LLC's address in Brooklyn, NY, it was actually mailed from Miami, [Florida] as indicated by the post office stamp on the envelope.") (citing (Pl. Stat. (DE [66]) Ex. S at 151)).

Order, Doc 82, p. 6.

Notably, Plaintiffs produced an envelope from Defendants with postage indicating that it was mailed from zip code 11217, which is in Brooklyn, New York:



Doc 66-1, p. 132.

The district court erred in concluding that M. Valentin's and A. Acevedo's use of K. Valentin as an intermediary, messenger, and conduit for interstate

communication with Defendants' New York employees did not trigger individual coverage. Doc 82, pp. 12-13.

The district court erred in not addressing Plaintiffs' argument that they were also individually covered as domestic service employees. Doc 55, pp. 8-10.

## <u>CONCLUSION</u>

This Court should reverse the district court's Order [Doc 82] granting Defendants' Motion for Summary Judgment [Doc 44], and remand for a jury trial.

Dated: November 10, 2022                  Respectfully submitted,

KOZ LAW, P.A.
800 East Cypress Creek Road
Suite 421
Fort Lauderdale, Florida 33334
Telephone: (786) 924-9929
ekoz@kozlawfirm.com

*/s/ Elliot A. Kozolchyk*
Elliot Kozolchyk
Bar No.: 74791
Attorney for Appellants

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 8,580 words (according to the word-count function of the word-processing program used to prepare this brief), excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 version 2208 in 14-point font size and Times New Roman font.

*/s/ Elliot A. Kozolchyk*
Elliot A. Kozolchyk
*Attorney for Plaintiffs-Appellants*
Dated: 11/10/22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify I electronically filed the foregoing using CM/ECF system, which will send a notice of electronic filing to all counsel of record and that a true and correct copy of Appellants' Brief has been furnished by U.S. Mail to counsel of record:

> Adi Amit, Esq.
> ADI AMIT, P.A.
> 101 NE Third Avenue
> Suite 300
> Fort Lauderdale, Florida 33301
> adi@defenderofbusiness.com
> *Attorney for Defendants-Appellees*
>
> */s/ Elliot A. Kozolchyk*
> Elliot A. Kozolchyk

37